# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**LETICIA VILLARREAL**                                                    **PLAINTIFF**

**v.**                          **Case No.  1:16-cv-00163 KGB**

**KENNETH DEWITT,** *et al.*                                            **DEFENDANTS**

## OPINION AND ORDER

Before the Court are the motion for summary judgment filed by defendants Larry Norris, Ray Hobbs, Wendy Kelley, Linda Dixon, Maggie Capel, Linda Dykes, Christopher Budnik, Nurzuhal Faust, and John Maples, collectively the Arkansas Department of Correction Defendants ("ADC defendants") (Dkt. No. 21),[1] plaintiff Carolyn Arnett's motion for leave to file an executed exhibit No. 10 (Doc. #28-10), *INSTANTER* (Dkt. No 31),[2] and Ms. Arnett's motion for leave to file supplemental documents in opposition to ADC defendants' motion for summary judgment (Dkt. No. 33).[3]

On September 7, 2017, plaintiff Carolyn Arnett filed a complaint pursuant to 42 U.S.C. §§ 1983 and 1985, alleging that she was sexually abused repeatedly by former ADC Chaplain Kenneth Dewitt, that ADC defendants and others failed to protect her from such abuse, and that

---

[1]  This motion was filed in the case *Arnett v. Norris*, Case No. 1:17-cv-00076, before the case was consolidated with *Villarreal v. Dewitt*, Case No. 1:16-cv-00163.  The motion remains pending in the *Arnett* case, and the Court refers to the docket number assigned to this filing in that case.  Throughout this Order, the Court will specify by reference to case the matter in which the filing was made or the motion remains pending.

After consolidation, the Court designated *Villarreal* as the lead case and directed the parties to make all filings in the *Villarreal* case.  Therefore, the Court enters this Opinion and Order in the *Villarreal* case.

[2]  *Arnett v. Norris*, Case No. 1:17-cv-00076.

[3]  *Villarreal v. Dewitt*, Case No. 1:16-cv-00163.

ADC defendants and others retaliated against her and continue to retaliate against her (Dkt. No. 1).[4] Ms. Arnett seeks compensatory and punitive damages (*Id.*, at 45). On February 7, 2018, ADC defendants filed the present motion seeking a grant of summary judgment on the basis that Ms. Arnett failed to exhaust administrative remedies (Dkt. No. 21).[5] ADC defendants claim that Ms. Arnett has not exhausted any grievances regarding her "specific claims of (a) cruel and unusual punishment; (b) failure to protect, failure to supervise, retaliation; (c) alleged widespread sexual misconduct; or (d) conspiracy" (Dkt. No. 22, at 10).[6] Ms. Arnett opposes the motion (Dkt. No. 28).[7] On March 15, 2018, Ms. Arnett filed a motion for leave to file an executed exhibit No. 10 (Doc. #28-10), *INSTANTER* (Dkt. No. 31).[8] ADC defendants filed a response in opposition to the motion on the same day (Dkt. No. 32).[9] On March 31, 2018, this Court consolidated Ms. Arnett's case, *Arnett v. Norris, et al.,* Case No. 1:17-cv-00076-KGB, with *Villarreal v. DeWitt, et al.*, Case No. 1:16-cv-00163-KGB, and directed all parties to make filings only in the *Villarreal* case going forward (Dkt. No. 34).[10] On May 22, 2018, Ms. Arnett filed a motion for leave to file supplemental

---

[4] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[5] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[6] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[7] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[8] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[9] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[10] *Arnett v. Norris*, Case No. 1:17-cv-00076.

documents in opposition to ADC defendants' motion for summary judgment (Dkt. No. 33).[11] ADC defendants oppose that motion (Dkt. No. 34).[12]

For the following reasons, the Court grants Ms. Arnett's motion for leave to file an executed Exhibit No. 10 (Doc. #28-10), *INSTANTER* and Ms. Arnett's motion for leave to file supplemental documents in opposition to ADC defendants' motion for summary judgment, and the Court denies the ADC defendants' motion for summary judgment.

## I.      Ms. Arnett's Motion For Leave To File An Executed Exhibit No. 10

On March 15, 2018, Ms. Arnett filed a motion for leave to file an executed exhibit No. 10 (Doc. #28-10), *INSTANTER* (Dkt. No 31).[13] Ms. Arnett attached an unexecuted copy of a similar affidavit to her response to ADC defendants' motion for summary judgment (Dkt. No. 28-10).[14] She explained in her initial response that, as of the time of filing, Ms. Arnett's notarized affidavit had not yet arrived at the office of her counsel but that the notarized affidavit would be submitted to the Court when received (Dkt. No. 28, at 17 n.1).[15] ADC defendants filed a response to Ms. Arnett's motion arguing that Ms. Arnett should not be allowed to file the executed affidavit, or, in the alternative, that ADC defendants should be allowed to file a supplemental reply to address the

---

[11] *Villarreal v. Dewitt*, Case No. 1:16-cv-00163.

[12] *Villarreal v. Dewitt*, Case No. 1:16-cv-00163.

[13] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[14] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[15] *Arnett v. Norris*, Case No. 1:17-cv-00076.

"discrepancy" between the unexecuted affidavit and the executed affidavit (Dkt. No. 32).[16] Ms. Arnett replied (Dkt. No. 33).[17]

Ms. Arnett asserts that she was unable to clear the original affidavit through the prison system in time for filing (Dkt. No. 31, ¶ 2). She contends that its content is slightly different to that of the unsigned Exhibit 10 (Dkt. No 28-10), as she added a portion regarding certain defendants unbeknownst to her (Dkt. No. 31, ¶ 3). In their response to Ms. Arnett's motion for leave to file executed affidavit, ADC defendants argue that Ms. Arnett's proposed executed affidavit is factually different from the unsigned and undated affidavit counsel for Ms. Arnett submitted in response to ADC defendants' motion for summary judgment (Dkt. No. 32, ¶ 1). ADC defendants request leave to file a brief response regarding the discrepancy (*Id.*, ¶ 2). In her reply in support of her motion for leave to file an executed Exhibit No. 10 (Doc. #28-10), *INSTANTER*, Ms. Arnett contends the affidavit she seeks to file with her motion for leave is merely for completeness and is not prejudicial (Dkt. No. 33). The Court agrees.

For good cause shown, the Court grants Ms. Arnett's motion for leave to file an executed affidavit (Dkt. No. 31). The Court will consider the executed affidavit in the following discussion.

## II. Ms. Arnett's Motion For Leave To File Supplemental Documents

On May 22, 2018, Ms. Arnett filed a motion for leave to file supplemental documents in opposition to ADC defendants' motion for summary judgment (Dkt. No. 33).[18] ADC defendants oppose that motion (Dkt. No. 34).[19] Ms. Arnett wishes to file supplemental documents consisting

---

[16] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[17] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[18] *Villarreal v. Dewitt*, Case No. 1:16-cv-00163.

[19] *Villarreal v. Dewitt*, Case No. 1:16-cv-00163.

of an affidavit and supporting documents that she alleges substantiate ongoing institutional retaliation against her for coming forward about her abuse (Dkt. No. 33, ¶¶ 1, 2). ADC defendants argue that the supplemental documents Ms. Arnett seeks to file offer nothing on the issue of exhaustion which is the basis of the ADC defendants' motion (Dkt. No. 34, ¶ 3).

For good cause shown, the Court grants the motion for leave to file supplemental documents in opposition to ADC defendants' motion for summary judgment (Dkt. No. 33). The Court will consider the supplemental documents in the following discussion.

## III. ADC Defendants' Motion For Summary Judgment

### A. Factual Background

Unless otherwise noted, the following facts are taken from ADC defendants' statement of material facts not in dispute and Ms. Arnett's counter-statement of undisputed material facts (Dkt. Nos. 23, 29).[20]

Ms. Arnett, ADC #706556, is an inmate incarcerated in the McPherson Unit in Newport, Arkansas, and is serving a sentence of life without parole (Dkt. No. 29, ¶¶ 1, 2). Ms. Arnett entered the Arkansas Department of Corrections ("ADC") in November 1999 (*Id.,* ¶ 3). ADC defendants contend that, upon entering the ADC, inmates are provided a copy of the Inmate Handbook (Dkt. No. 23, ¶ 4.). Ms. Arnett maintains that she received an Inmate Handbook when she entered McPherson (Dkt. No. 29, ¶ 4). ADC defendants contend that the Inmate Handbook provides the inmate with basic information about the department's policies and procedures and that all department policies, including the inmate grievance policy, are available to inmates in the unit's law library (Dkt. No. 23, ¶ 5). Ms. Arnett admits that her Inmate Handbook provides the guidelines

---

[20] *Arnett v. Norris*, Case No. 1:17-cv-00076.

for filing a grievance at McPherson and that the ADC Grievance Policy No. 835 is available in the law library (Dkt. No. 29, ¶ 5).  Ms. Arnett was provided with a copy of the Inmate Handbook on November 9, 1999 (*Id.*, ¶ 6).  Ms. Arnett avers that she was never given a copy of the ADC Administrative Directives and has never seen or read them (Dkt. No. 28-9).[21]

Ms. Arnett alleges that former ADC Chaplain Kenneth Dewitt began sexually assaulting her in December 2010 (Dkt. No. 29., ¶ 8)  Ms. Arnett claims that Mr. Dewitt sexually assaulted her once a week between December 2010 and June 2012 (*Id.*).  She further claims that Mr. Dewitt increased his assaults against her to twice a week June 2012 until his resignation in September 2014 (*Id.,* ¶ 9).  Ms. Arnett alleges that the other named defendants knew, or should have known, about the assaults that were occurring between December 2010 and September 2014, yet the other named defendants did nothing to protect her (*Id.*, ¶ 10).

ADC defendants submit that the ADC has a policy in place that affords inmates an administrative mechanism for the resolution of complaints, problems, and other issues and that it is called the Inmate Grievance Procedure (Dkt. No. 23, ¶ 11).  Ms. Arnett argues that the ADC has such guidelines which are contained in the Inmate Handbook but which are not called the "Inmate Grievance Procedure" nor contained in the ADC Administrative Directive ("AD") (Dkt. No. 29, ¶ 11).  ADC defendants contend that the grievance policy is explained, in detail, in the ADC's Administrative Directives and that the Administrative Directives explain the Administrative Regulations, laws, policies, and establish specific procedures for their implementation throughout the Department (Dkt. No. 23, ¶ 12).  Ms. Arnett denies this claim (Dkt. No. 29, ¶ 12).  ADC defendants contend that the Administrative Directives are reviewed and may be revised periodically (Dkt. No. 23, ¶ 13).  Ms. Arnett asserts that she cannot comment competently on

---

[21] *Arnett v. Norris*, Case No. 1:17-cv-00076.

ADC's diligence, or lack thereof, in terms of following their internal employee directives (Dkt. No. 29, ¶ 13). ADC defendants submit that, since December 2010, the ADC has had four Administrative Directives covering the inmate grievance policy: AD 09-01 became effective on January 30, 2009 (it superseded AD 07-03), AD 10-32 became effective on January 1, 2011 (it superseded AD 09-01), AD 12-16 became effective on May 28, 2012 (it superseded AD 10-32), and AD 14-16 became effective on April 11, 2014 (it superseded AD 12-16) (Dkt. No. 23, ¶ 14). ADC defendants contend that AD 14-16 is the current inmate grievance policy (Dkt. No. 23, ¶ 15). Ms. Arnett denies that AD 14-16 is the current inmate grievance policy and argues that AD 14-16 is an internal employee directive which she has never seen (Dkt. No. 29, ¶¶ 14, 15). Instead, she submits that the current inmate grievance policy is found in the Inmate Handbook and in the ADC Grievance Policy No. 835 as the current inmate grievance policy (*Id.*, ¶ 11; Dkt. Nos. 28, at 9; 28-5; 28-9).

ADC defendants contend that the ADC grievance policy instructs an inmate to file a grievance if he or she believes that he or she has been wronged (Dkt. No. 23, ¶ 16). Ms. Arnett admits that, under the "Prison Rape Elimination Act" provision of her Inmate Handbook, she was instructed not to be a silent victim of sexual assault or rape (Dkt. No. 29, ¶ 16). ADC defendants assert that the inmate grievance procedure is a multi-step policy (Dkt. No. 23, ¶17). Ms. Arnett denies this allegation (Dkt. No. 29, ¶ 17). ADC defendants assert that Step One of the ADC grievance policy instructs an inmate to file an Informal Resolution within 15 days after the occurrence of an incident (Dkt. No. 23, ¶ 18). Ms. Arnett denies this allegation and cites grievance number MCP-17-00010, which she filed on January 10, 2017, and which does not include the instruction to file an Informal Resolution within 15 days after the occurrence of an incident (Dkt. No. 29, ¶ 18). Ms. Arnett contends that the Inmate Handbook does provide guidelines on the

"Informal Resolution Form" (*Id.*). ADC defendants contend that the inmate is to write, in the space provided on the form, a brief statement that is specific as to the substance of the issue or complaint to include the date, place, personnel involved, or witnesses, and how the policy or incident affected the inmate submitting the form (Dkt. No. 23, ¶ 19). Ms. Arnett denies this allegation and asserts that this information is provided on the grievance form itself (Dkt. No. 29, ¶ 19). ADC defendants contend that the Informal Resolution should be presented to a designated problem-solver who will respond to the Informal Resolution according to the time limits stated in the policy (Dkt. No. 23, ¶¶ 20, 21). Ms. Arnett denies that the Informal Resolution should be presented to a designated problem-solver and cites as the materials she consulted an excerpt from the Inmate Handbook and an excerpt from the ADC Grievance Policy No. 835 (Dkt. No. 29, ¶ 20). As to the January 10, 2017, grievance, Ms. Arnett contends that grievance did not require a designated problem-solver (*Id.*).

ADC defendants state that, if the inmate is not satisfied with the response to the Informal Resolution,[22] the inmate is then allowed to proceed to Step Two of the process, which is the formal Grievance Procedure (Dkt. No. 23, ¶ 22). According to ADC defendants, a grieving inmate is to receive a response to the formal grievance (Step Two) from the warden or warden's designee, within 20 working days of receipt (or less if it is an emergency situation) (*Id.*, ¶ 23). ADC defendants contend that, upon response from the warden or his designee, if the inmate does not agree with the decision, the inmate is to appeal within five days to the Chief Deputy Director or Assistant Director's Level (*Id.*, ¶ 24). ADC defendants maintain that, even if the inmate receives

---

[22] ADC defendants refer to "Information Resolution" in their filings, but the Court understands and interprets this as reference to the "Informal Resolution."

no response from the warden after the expiration of 20 days, the inmate is allowed to appeal promptly (*Id.*, ¶ 25).

In response to the ADC defendants' explanation of the grievance process, Ms. Arnett contends that she cannot comment competently on the ADC's diligence, or lack thereof, in terms of following their internal employee directives (Dkt. No. 29, ¶¶ 22, 23, 24). Ms. Arnett denies that the Administrative Directive 14-16 serves as a guideline for inmates (*Id.*, ¶ 24). She cites her March 1, 2018, affidavit in which she alleges that the Inmate Handbook has a section entitled Grievances which describes the process for inmates who wish to file a formal grievance (*Id.*, ¶¶ 24, 25).

ADC defendants contend that the Chief Deputy, Deputy, or Assistant Director will respond in writing to the inmate concerning the decision within 30 working days and that the entire grievance procedure should be completed within 76 working days (Dkt. No. 23, ¶¶ 26, 27). ADC defendants allege that a grievance is exhausted once the Deputy Director has responded to the inmate's appeal (*Id.*, ¶ 28). Ms. Arnett denies that Administrative Directive 14-16 serves as a guideline for inmates (Dkt. No. 29, ¶¶ 26, 27). Ms. Arnett denies that the grievance procedure is exhausted once the Deputy Director has responded to the inmate's appeal and instead maintains that her grievance was exhausted without the Deputy Director ever responding to any appeal (*Id.*, ¶ 28). Ms. Arnett contends that there was no appeal because she did not challenge Warden A. Fitzgerald's determination that her January 10, 2017, grievance had merit (*Id.*).

ADC defendants assert that the grievance policy allows an inmate to skip Step One of the grievance process and go directly to Step Two if the inmate believes the issue to be emergent (Dkt. No. 23, ¶ 31). ADC defendants submit that the grievance policy defines an "emergency" as:

> a problem, that if not immediately addressed, subjects the inmate to a substantial risk of personal injury or other serious and irreparable harm such as sexual assault,

physical abuse, sexual misconduct or sexual harassment. Emergency grievances may be submitted without the completion of step one, the informal process; however, if the grievance is found to not involve a substantial risk of personal injury or serious and irreparable harm, it will be returned to the problem solver and processed under Step One.

(*Id.*, ¶ 29; Dkt. No. 23-2, at 2). ADC defendants contend that designating a grievance as an emergency does not obviate the inmate's need or requirement to file a grievance; however, it streamlines the reporting process for the inmate, which allows the issue to be brought to the attention of staff sooner (*Id.*, ¶ 30). Ms. Arnett denies that Administrative Directive 14-16 serves as a guideline for inmates (Dkt. No. 29, ¶ 31).

ADC defendants assert that inmates are notified in at least three separate sections of the grievance policies that exhaustion of their administrative remedies is required prior to filing a § 1983 lawsuit (Dkt. No. 23, ¶ 32). Ms. Arnett denies this allegation and asserts that McPherson grievance guidelines and policies are found in two locations: the Inmate Handbook and the ADC Grievance Policy No. 835 (Dkt. No. 29, ¶ 32).

Rose Higgins is the Inmate Grievance coordinator at the McPherson Unit for the Arkansas Department of Correction (Dkt. No. 23, ¶ 33). ADC defendants assert that Ms. Higgins has reviewed Ms. Arnett's grievance history for purposes of this litigation (*Id.*, ¶ 34). Ms. Arnett denies that Ms. Higgins has reviewed Ms. Arnett's grievance history for purposes of this litigation, citing two grievances Ms. Arnett filed in 2017 which are not referenced in Ms. Higgins' affidavit and claiming, had Ms. Higgins reviewed Ms. Arnett's grievance history for purposes of this litigation, she would have cited these grievances (Dkt. No. 29, ¶ 34).

ADC defendants maintain that, prior to 2010, Ms. Arnett did not file any Informal Resolutions or formal grievances (Dkt. No. 23, ¶ 35). During the year 2010, Ms. Arnett submitted two (*Id.*, ¶ 36). Both were submitted on April 8, 2010 (*Id.*). In Ms. Arnett's first Informal

Resolution, she complained about comments allegedly made to her by Sgt. Arnold, a non-party (*Id.*, ¶ 37). Sgt. Michael Dickinson, a non-party, responded to Ms. Arnett's Informal Resolution on April 12, 2010 (*Id.*, ¶ 38). Dissatisfied with Sgt. Dickinson's response, Ms. Arnett proceeded to Step Two of the grievance procedure that same day (*Id.*, ¶ 39). Ms. Higgins received the grievance the following day and assigned it the number of MCP-10-00340 (*Id.*, ¶ 40). ADC defendants contend that grievances are assigned numerical numbers in the order in which they are received by Ms. Higgins' office (*Id.*, ¶ 41).[23] Ms. Arnett alleges that she cannot comment competently on Ms. Higgins' diligence, or lack thereof, in terms of following ADC internal employee directives (Dkt. No. 29, ¶ 41). Ms. Higgins informed Ms. Arnett, in writing, that her grievance would be addressed by the Warden or Center Supervisor or designee by May 11, 2010 (Dkt. No. 23, ¶ 42). Warden Maples responded to Ms. Arnett's appeal of grievance MCP-10-00340 on May 6, 2010 (Dkt. No. 29, ¶ 43). Ms. Arnett chose not to appeal Warden Maples' decision (*Id.*, ¶ 44). Ms. Arnett did not allege in grievance MCP-10-00340 that she was being sexually assaulted by Chaplain Dewitt (*Id.*, ¶ 45).

In Ms. Arnett's second Informal Resolution, she again complained about Sgt. Arnold's comments and how they made her feel (*Id.*, ¶ 46). Sgt. Michael Dickinson responded to Ms. Arnett's Informal Resolution on April 12, 2010 (*Id.*, ¶ 47). Dissatisfied with Sgt. Dickinson's response, Ms. Arnett proceeded to Step Two of the grievance procedure that same day (*Id.*, ¶ 48). Ms. Higgins received the grievance the following day and assigned it the number of MCP-10-00341 (*Id.*, ¶ 49). Ms. Higgins informed Ms. Arnett, in writing, that her grievance would be addressed by the Warden or Center Supervisor or designee by May 11, 2010 (*Id.,* ¶ 50). Warden

---

[23] ADC defendants' statement of undisputed material facts states that grievances are assigned numerical numbers in the order in which they are received by "my" office, and the Court understands "my" to be Ms. Higgins' office (Dkt. No. 23, ¶ 41).

Maples responded to Ms. Arnett's appeal of grievance MCP-10-00341 on May 2, 2010 (*Id.*, ¶ 51). Ms. Arnett chose not to appeal Warden Maples' decision (*Id.,* ¶ 52). Ms. Arnett did not allege in grievance MCP-10-00341 that she was being sexually assaulted by Chaplain Dewitt (*Id.*, ¶ 53).

Ms. Arnett did not file any Informal Resolutions or formal grievances in 2011 or in 2012 (*Id.*, ¶¶ 54-55). In 2013, Ms. Arnett submitted two (*Id.*, ¶ 56). On October 15, 2013, Ms. Arnett submitted an Informal Resolution regarding medical issues (*Id.*, ¶ 57). It was marked for medical, and medical personnel responded to the Informal Resolution on October 18, 2013 (*Id.*, ¶ 58). Ms. Arnett proceeded to Step Two of the process and submitted it as a formal grievance (*Id.*, ¶ 59). The formal grievance was received in the Grievance Office on October 21, 2013 (*Id.*, ¶ 60). It was assigned number MCP-13-01015 (*Id.*). Because the grievance was of a medical nature, it was forwarded, pursuant to policy, to the Health Services Administrator for a response (*Id.*). The Health Services Administrator responded to grievance MCP-13-01015 on November 14, 2013 (*Id.*, ¶ 61). Ms. Arnett did not appeal the Health Services Administrator's response to grievance MCP-13-01015 (*Id.*, ¶ 62). Ms. Arnett did not allege in grievance MCP-13-01015 that she was being sexually assaulted by Chaplain Dewitt (*Id.*, ¶ 63).

The second 2013 Informal Resolution was submitted by Ms. Arnett on November 4, 2013 (*Id.*, ¶ 64). In it, she addressed a medical issue (*Id.*). Her Informal Resolution was addressed by the medical department on November 7, 2013 (*Id.*, ¶ 65). Ms. Arnett proceeded to Step Two of the grievance process on November 8, 2013 (*Id.*, ¶ 66). The formal grievance was received in the Grievance Office on November 12, 2013, and it was assigned number MCP-13-01067 (*Id.*, ¶¶ 67, 68). Because the grievance was of a medical nature, it was forwarded, pursuant to policy, to the Health Services Administrator for a response (*Id.*, ¶ 69). The Health Services Administrator responded to the grievance MCP-13-01067 on November 14, 2013 (*Id.*, ¶ 70). Ms. Arnett did not

appeal the Health Services Administrator's response to grievance MCP-13-01067, nor did she allege in grievance MCP-13-01067 that she was being sexually assaulted by Chaplain Dewitt (*Id.*, ¶¶ 71, 72).

ADC defendants contend that Ms. Arnett did not file any Informal Resolutions or formal grievances in 2014 (Dkt. No. 23, ¶ 73). Ms. Arnett denies this allegation and asserts that she attempted to file a grievance in December 2014 but was prevented from doing so by certain defendants (Dkt. No. 29, ¶ 73). In support of this assertion, Ms. Arnett cites grievance number MCP-17-00010 and a witness statement she wrote on December 29, 2014, signed by ADC defendant Linda Dykes (*Id.*). In MCP-17-00010, Ms. Arnett wrote

> I have been an inmate since 1999 here at McPherson. Between the years of 2010 to 2014 I was a victim of repeated sexual assault and misconduct, and physical and mental abuse caused by Kenneth Dewitt. I was also a victim of retaliation after I reported the abuse. Those who retaliated against me include Kenneth Dewitt, members of his family, Stacey Smith, Jennifer Smith, Chaplain Yancey, Nurzuhal Faust, Linda Dixon, Linda Dykes, and I also believe prison staff failed to protect me from this misconduct dispite [sic] awareness of this misconduct. This matter was brought to the attention of ADC in late 2014, and I wrote out several witness statements. In the event that my statements were not part of a formal grievance process, I request that one be initiated now.

(Dkt. No. 28-1, at 1).[24]

In a witness statement written on December 29, 2014, Ms. Arnett wrote:

> About December 2010 Chaplain Dewitt began to talk to me in a way of being sexual asking me about my desires concerning men, do I ever have or have I had a desire towards him. He told me that it was [sic] normal because the training is like that of a wife. After a few of these conversations he began to touch me and tell me it was okay and he began to initiate me touching him with his hands. It led to a process of a one sided physical relationship of oral sex with him for a while and then he began to touch me however I guess I didn't respond right because he would make fun of me and make statements like Oh my God your [sic] a virgin, and I cried when he tried to masterbate [sic] with me that was really hard because he said I didn't know anything because I couldn't tell him if I climaxed. From there I would try by his statements of what I wasn't doing right to try to figure out what he

---

[24] *Arnett v. Norris*, Case No. 1:17-cv-00076.

wanted and from then on thats [sic] what I tried to do. Things began to get worse over a process of time he began to bring in birth control suppositories from the free world they would be hidden in his groin area by his zipper when the physical sex started out a year and a half ago. I was sitting in the barracks one Sunday morning and had a weird feeling something was up and I walked down the hall to the chaplain's office and caught him with Inmate L. MacKool having sex. I did not say anything right then but the next morning there was a mess in the floor and I went in and cleaned it up and he asked me what I was doing it trailed from the office door to around his desk. I told him I was cleaning up his mess later that afternoon I asked him about it and I told him I knew what I was cleaning up this morning he said, "I'm a chaplain, and I meet needs," he told me not to say anything or I would destroy the program. I felt trapped, I let fear shut my mouth. Later on I was coming out from work and L. MacKool was with me and I was out first when I walked up to the door I saw him with L. Villarreal acting out sexually and walked back through the gate and called Leslie out loud within seconds he was out the door instructing me to go get [illegible] for our visitors that were coming. He was very aggressive with me in the way he talked to me one day he back [sic] me up in the office and I was crying and he told me that he would put me out of the program, they didn't need me and I was replaceable, how dare I challenge him I quickly cowered down like always and asked him to forgive me, he told me to remember what he said. He used my fears against me to control me because he knew how much the program meant to me. I kept my mouth shut. There was a confrontation about Mr. Dewitt and Stacey Smith that happened in the free world about their physical relationship. Chaplain Stacey Smith came in the office while Chaplain Dewitt was gone to Utah about 2 weeks before he retired and Chaplain Smith confronted me, L. Villarreal, and L. MacKool about our sexual relationships in the office with Mr. Dewitt. She said he called her from Utah and told her he was going to prison and told her he had a physical relationship with all of us. She asked me what was going on in the office. I said whats [sic] not been going on in the office. I told her about my part of the physical relationship with Mr. Dewitt. She told me she forgave me like I did something wrong to her. At one time me and MacKool were having problems. I told her that I couldn't keep working in the office with the way things I had to deal with like Leslie standing behind me raising her shirt rubbing her stomach looking at Mr. Dewitt. She told me that I had to understand she was in training like a wife and she understood her struggles.

(Dkt. No. 28-6).[25]

Underneath Ms. Arnett's statement, a handwritten notation reads: "This issue was stopped

per Internal Affairs" (*Id.*, at 3). It is unclear from the record who wrote this handwritten notation.

---

[25] *Arnett v. Norris*, Case No. 1:17-cv-00076.

ADC defendants contend that Ms. Arnett did not notify anyone of Mr. Dewitt's actions toward her until December 2014, when she shared the information with another inmate (Dkt. No. 23, ¶ 74). Ms. Arnett asserts that she did not notify ADC staff about her abuse until December 2014 (Dkt. No. 29, ¶ 74).

ADC defendants contend that, if an inmate such as Ms. Arnett appeals the Warden's decision or the Health Services Administrator's decision, the appeal is forwarded by the inmate to the ADC's Central Office, where the appeal is directed to the Deputy or Assistant Director over the unit (Dkt. No. 23, ¶ 75). Ms. Arnett maintains that she cannot comment competently on the ADC's diligence, or lack thereof, in terms of following their internal employee directives (Dkt. No. 29, ¶ 75).

Ms. Arnett also maintains that she wrote a second witness statement on February 10, 2016 (Dkt. No. 28-7).[26] This statement refers to a conversation Ms. Arnett alleges she had with defendant Jennifer Smith in July 2015 regarding the Dewitt family's ongoing involvement in ministry.

On May 22, 2018, Ms. Arnett filed a motion for leave to file supplemental documents in opposition to ADC defendants' motion for summary judgment (Dkt. No. 33).[27] The supplemental documents consist of an affidavit and supporting documents (*Id.*). In her May 15, 2018, affidavit, Ms. Arnett alleges that she was "stripped on the way out in the officers [sic] bathroom with no cameras and on the way back in I was told I had to be on camera" which "made [her] feel violated" and was "mortifying" "[i]n light of what [she has] experienced in regards to being violated [] in prison" (Dkt. No. 33-1, at 1). On January 18, 2018, Ms. Arnett filed a grievance based on this

---

[26] *Arnett v. Norris*, Case No. 1:17-cv-00076.

[27] *Villarreal v. Dewitt*, Case No. 1:16-cv-00163.

experience which was assigned grievance number MCP-18-00104 (*Id.*). She filed another grievance on January 30, 2018, after she had a sick call and did not start to feel better but "[medical] still would not see [her]" (*Id.*, at 2). This grievance was assigned number MCP-18-00137 (*Id.*, at 8). Ms. Arnett was not called down to medical until February 27, 2018 (*Id.*, at 2-3).

On April 25, 2018, Ms. Arnett filed a grievance because she had not received the results of her January 2018 surgery despite "speaking with everyone possible in attempt to get [her] results in regards to [her] surgery to no avail" (*Id.*, at 3-4). Ms. Arnett alleges that she spoke with "Mrs. Baiza, Mrs. Bledsoe, Dr. Hughes, and Mr. Bernard Williams all on more than one occassion [sic]" and "wrote on at least 2 of [her] sick calls in the process that [she] had not received [her] results" (*Id.*, at 4). According to Ms. Arnett, "Mr. Bernard Williams in the presence of Mrs. Baiza on 4-12-18 said he would get [her] results that afternoon" (*Id.*). After 15 days, "[she] wrote a grievance due to still no response" (*Id.*). This grievance was assigned number MCP-18-00564 (*Id.*).

On May 3, 2018, Ms. Arnett wrote another grievance because "[she] still had not got [sic] a response to grievance (MCP-18-00564)" (*Id.*, at 5). After speaking with Ms. Baiza on May 8, 2018, Ms. Arnett "dropped both grievances [Ms. Baiza] gave back to [Ms. Arnett] (MCP-18-00563-MCP-18-00564) in the grievance box together on 5-8-18 for second step" (*Id.*). Ms. Arnett "only received acknowledgement for grievance (MCP-18-00563) in which [she] wrote for not responding to [her] original grievance (MCP-18-00564)," but she "dropped a request to the grievance officer on 5-9-18" (*Id.*). Ms. Arnett "only wrote grievance MCP-18-00563 because once again, [she] was not getting a response in regards to [her] medical needs" (*Id.*, at 6). Ms. Arnett states she is "being retaliated against for reporting prison misconduct" (*Id.*).

In their response in opposition to plaintiff's motion for leave to file supplemental documents in opposition to motion for summary judgment, ADC defendants argue that Ms. Arnett

attached three nonexhausted grievances and one Inmate Request Form in support of her affidavit (Dkt. No. 34, ¶ 5).[28]  ADC defendants contend that all three nonexhausted grievances pertain to medical issues and non-ADC staff members and that Ms. Arnett does not allege she is being retaliated against for reporting Mr. Dewitt's actions in December 2014 in the three 2018 nonexhausted grievances (*Id.*, ¶ 6).  ADC defendants assert that none of the ADC defendants are currently working at the McPherson Unit where Ms. Arnett is housed, nor have they since January 2018 (*Id.*, ¶ 7).

### B.      Standard Of Review

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact in dispute and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).  "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 447 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed,

---

[28]  *Villarreal v. Dewitt*, Case No. 1:16-cv-00163.

and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### C. Discussion

### 1. Exhaustion Of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that an inmate exhaust prison grievance procedures before filing suit in federal court. *See* 42 U.S.C. § 1997e(a), *et seq.*; *Jones v. Bock*, 549 U.S. 199, 202 (2007). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014) (quoting *Jones*, 549 U.S. at 218). The benefits of exhaustion include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones*, 549 U.S. at 219; *see also Woodford v. Ngo*, 548 U.S. 81, 93-95 (2006). If "exhaustion was not completed at the time of filing, dismissal is mandatory." *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003). Prisoners need not plead compliance with the exhaustion requirement; "[n]onexhaustion is an affirmative defense, and defendants have the burden of raising and proving the absence of exhaustion." *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) (citing *Jones*, 549 U.S. at 211-12).

The PLRA "requires exhaustion of only 'such administrative remedies as are available.'" *Townsend v. Murphy*, 898 F.3d 780, 783 (8th Cir. 2018) (quoting 42 U.S.C. § 1997e(a)). In *Ross v. Blake*, 136 S.Ct. 1850 (2016), the Supreme Court found relevant three kinds of circumstances in which an administrative remedy is not available: where the administrative procedure "operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," where the administrative scheme is "so opaque that it becomes, practically

speaking, incapable of use," and where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S.Ct. at 1859-60*; see also Townsend*, 898 F.3d at 783. An inmate's subjective beliefs regarding exhaustion are irrelevant in determining whether administrative procedures are available. *See Chelette v. Harris*, 229 F.3d 684, 688 (8th Cir. 2000).

## 2. Operative Grievance Policy

Ms. Arnett maintains in response to the ADC defendants' explanation of the grievance process that Administrative Directive 14-16 serves as an internal employee directive only, and she maintains that she cannot comment competently on the ADC's diligence, or lack thereof, in terms of following their internal employee directives (Dkt. No. 29, ¶¶ 22, 23, 24). Ms. Arnett denies that the Administrative Directive 14-16 serves as a guideline for inmates (*Id.*, ¶ 24). Instead, she cites her March 1, 2018, affidavit in which she alleges that the Inmate Handbook has a section entitled Grievances which describes the process for inmates who wish to file a formal grievance (*Id.*, ¶¶ 24, 25).

The parties do not appear to dispute that the Inmate Handbook states in regard to grievances:

> **Grievance**
> To file a formal grievance, fill out the appropriate forms that can be found at the hall desk, count room or other location within the unit. If an inmate is unable to read or write, an officer or other staff can help fill out the forms. Place the finished forms in the grievance box or unit mailbox. Only three formal grievances a week are allowed unless an emergency exists. Once the grievance has been answered at the unit level, the grievance can be appealed to the appropriate Deputy/Assistant Director. At that point, the inmate has exhausted his/her administrative remedies. The Director may intervene at his discretion. You cannot file a grievance on behalf of another inmate.
>
> **Emergency Grievance**
> Emergency grievances receive priority, and should be filed only if you are in substantial risk of personal injury or other serious harm. The staff responsible for

responding to your grievance will determine if it should be considered an emergency.

(Dkt. No. 23-7, at 4). The parties also do not dispute that Ms. Arnett signed for the Inmate Handbook (Dkt. No. 23-8).

Further, Ms. Arnett contends that, while an inmate, she consulted with "the Board of Corrections grievance policy" to which she refers as "Policy DOC 835" and to which the Court refers as ADC Grievance Policy No. 835 (Dkt. No. 28, at 9). She maintains that ADC Grievance Policy No. 835 mandates "that offenders are provided an opportunity to submit grievances regarding policy, conditions, incidents or actions related to incarceration/confinement which directly impact them." (Dkt. Nos. 28, at 9; 28-5). Ms. Arnett represents that ADC Grievance Policy No. 835 was available to her as an inmate (Dkt. No. 28, at 8-9). Ms. Arnett avers that she has never seen Administrative Directive 14-16 (*Id.*, at 10). Further, she maintains that neither the Inmate Handbook nor ADC Grievance Policy No. 835 reference the Administrative Directive or Administrative Directives ADC defendants now contend should control (*Id.*). Ms. Arnett avers that she was never given a copy of the ADC Administrative Directives and has never seen or read them (Dkt. No. 28-9).[29]

Administrative Directive 14-16 includes considerable detail noticeably absent from the Inmate Handbook's description of the grievance process and from ADC Grievance Policy No. 835 (Dkt. Nos. 23-5; 23-7; 28-5). Ms. Arnett contends that, based on the language of Administrative Directive 14-16, the document is intended as an internal ADC employee directive, not a document directed to inmates (Dkt. No. 28, at 9-10).

---

[29] *Arnett v. Norris*, Case No. 1:17-cv-00076.

In reply to this argument, the ADC defendants contend that, even if Ms. Arnett "didn't know about the policy (AD 14-16) or what the policy required her to do[,]. . . it doesn't excuse her from adhering to the policy." (Dkt. No. 30, at 3). The ADC defendants point to language in the Inmate Handbook that explains it "provides you with basic information about the department's policies and procedures." (Dkt. No. 23-7, at 3). Further, the ADC defendants maintain that the Inmate Handbook states: "All department policies available to inmates can be reviewed at your unit's law library." (*Id.*). With no affidavit to support the assertion, the ADC defendants claim that the Administrative Regulations, which the ADC defendants characterize Ms. Arnett as having reviewed, are available in the unit law library along with the Administrative Directives, which Ms. Arnett claims not to have reviewed (Dkt. No. 30, at 3).

The ADC defendants also maintain that Administrative Policy No. 835 references that administrative directives will be set forth by each agency establishing procedures and that such procedures:

> shall, at minimum provide for the following: offender notice of the grievance process; timely, effective and impartial processing of grievances, an appeals process; appropriate documentation of grievance activity; and speedy disposition of emergency situations, with security and safety the paramount concern.

(Dkt. No. 30, at 4).

The ADC defendants also assert that there are directions on the grievance form itself to instruct inmates on the process (Dkt. Nos. 30, at 4; *see also* 28-1). The Court notes that, based on record evidence, the grievance forms in effect in 2017 state, in pertinent part, the following:

> **BRIEFLY** state your one complaint/concern and be specific as to the complaint, **date**, place, name of personnel involved and how **you** were affected.

(Dkt. No. 28-1) (emphasis in original).

The grievance form in effect in 2017 also states:

***If you are harmed/threatened because of your use of the grievance process, report it immediately to the Warden or designee.***

(*Id.*) (emphasis in original).

In relation to appeals, the grievance form in effect in 2017 states:

**INMATE'S APPEAL**

If you are not satisfied with this response, you may appeal this decision within five working days by filling in the information requested below and mailing it to the appropriate Chief Deputy/Deputy/Assistant director along with the Unit Level Grievance Form. Keep in mind that you are appealing the decision to the original grievance. Do not list additional issues, which are not part of your original grievance as they will not be addressed. Your appeal statement is limited to what you write in the space provided below.

WHY DO YOU DISAGREE WITH THE ABOVE RESPONSE?

(*Id.*). This language, or similar language, appears in versions of the grievance forms in effect prior to 2017 (Dkt. Nos. 23-1; 23-2; at 18-28; 23-3, at 19-29; 23-4, at 19-29; 23-5, at 19-29).

This issue of what the grievance procedure requires is relevant to resolving the current motion because "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief but no ordinary prisoner can discern or navigate it." *Ross*, 136 S.Ct. at 1859. When this situation results in a circumstance in which "no ordinary prisoner can make sense of what [the prison grievance process] demands – then it is also unavailable." *Id.*

Further, in *Townsend v. Murphy*, the Eighth Circuit Court of Appeals examined an inmate's allegation that the grievance process was unavailable to him. 898 F.3d 780 (8th Cir. 2018). In *Townsend*, the plaintiff inmate averred in an affidavit that the prison grievance process was unavailable to him, in part, because he was allegedly denied access to the prison library, which contained the only available copy of the administrative directive. *Id.* at 783. The inmate also swore in his affidavit that a prison official misled him by advising him not to file a formal

grievance, which the ADC alleged was the second step in the prison's administrative process, without first receiving a response to his informal complaint.  *Id.*  The court concluded that, along with the ADC official's alleged statements, the denial of access to the prison library and a copy of the administrative directive "magnified the impact of" the ADC official's misstatements, as the inmate had no way to verify.  *Id.* at 783-84.  As a result, the court reversed the grant of summary judgment to the ADC official on the basis of exhaustion.

As an initial matter, the Court determines that, when all reasonable inferences from the record evidence are viewed in the light most favorable to Ms. Arnett, there is a genuine issue of material fact in dispute regarding what the ADC defendants communicated to inmates like Ms. Arnett about the grievance procedure and what Ms. Arnett should have, and did, understand about the grievance procedure.  This factual dispute, coupled with others as described by the Court in this Order, precludes a grant of summary judgment in favor of the ADC defendants on the issue of exhaustion.

Further, although the Court acknowledges this dispute among the parties regarding the requirements of the grievance process available to, and known by, Ms. Arnett, the Court need not resolve this dispute to resolve the pending motion for summary judgment.  Even if the Court assumes for purposes of resolving this motion only that the grievance procedure is what the ADC defendants represent it to be, the Court determines that other bases exist which require the Court to deny the ADC defendants' motion for summary judgment on the issue of exhaustion.

### 3.     Ms. Arnett's December 29, 2014 Witness Statement

According to Ms. Arnett's Affidavit No. 2, as well as her executed affidavit, she wrote out a witness statement on December 29, 2014, after she was summoned to ADC defendant Linda Dykes' office (Dkt. Nos. 28-10; 31-1, at 1).  In the statement, Ms. Arnett provides several details

about the emotional and physical sexual abuse she experienced from Mr. Dewitt and recounts a conversation she had with ADC defendant Stacey Smith about such abuse (Dkt. No. 28-6). Ms. Dykes signed the statement as a witness (*Id.*). Underneath Ms. Arnett's statement on the page reads a handwritten notation that states: "This issue was stopped per Internal Affairs" (*Id.*). It is unclear from the record who wrote this handwritten notation. ADC defendants do not mention this statement or the handwritten notation when moving for summary judgment on this affirmative defense, nor did they include it as an exhibit in the record evidence. Further, in their brief in support of their motion for summary judgment, ADC defendants contend that Ms. Arnett "did not notify anyone of Dewitt's actions towards her until December 2014, at which time she shared the information with another inmate" (Dkt. No. 22, at 9, 16).

Viewing the record evidence in the light most favorable to Ms. Arnett, the Court finds this statement of purported undisputed fact recited by ADC defendants and their argument in support of their motion for summary judgment on the affirmative defense of exhaustion at best incomplete and at worst deliberately misleading. According to Ms. Arnett, she was summoned to Ms. Dykes' office after speaking with inmate Bobbie Nicholson (Dkt. Nos. 1, ¶ 150; 31-1, at 1-2). As Ms. Arnett was in the process of writing out a witness statement, Warden Faust entered Ms. Dykes' office, ordered Ms. Arnett to stop writing, and discontinued the interview (Dkt. No. 1, ¶ 150). Warden Faust then excused Ms. Arnett from Ms. Dykes' office, informing her that Internal Affairs would handle the matter of her allegations of sexual abuse committed by Mr. Dewitt (*Id.*, ¶ 151). Ms. Dykes signed the witness statement where Ms. Arnett included details of Mr. Dewitt's emotional and sexual abuse of not only Ms. Arnett but also of two other inmates (Dkt. No. 28-6). Underneath Ms. Arnett's statement is a handwritten notation that states: "This issue was stopped per Internal Affairs" (*Id.*). It is unclear from the record who wrote this statement. To represent

that "it is undisputed that Ms. Arnett did not notify anyone of Mr. Dewitt's actions towards her until December 2014, at which time she shared the information with another inmate," without acknowledging the 2014 witness statement signed by Ms. Dykes, gives the Court pause and raises concerns (Dkt. No. 22, at 16).

In *Townsend*, the Eighth Circuit Court of Appeals found administrative remedies unavailable where a prison official misled an inmate by advising him not to file a formal grievance until the inmate received a response to his informal complaint. *Townsend*, 898 F.3d at 783; *see also Gibson v. Weber*, 431 F.3d 339 (8th Cir. 2005); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001). Viewing the record evidence in the light most favorable to Ms. Arnett, the Court concludes that Ms. Arnett raises an inference that prison officials similarly misled her by informing her that Internal Affairs would handle the matter of her allegations of sexual abuse committed by Mr. Dewitt (Dkt. Nos. 1, ¶ 151; 28-10, ¶¶ 1, 2; 31-1, at 1-2). Ms. Arnett's declaration that Warden Faust entered Ms. Dykes' office and ordered Ms. Arnett to stop writing, if accepted as true, would establish that the prison's formal grievance procedure was unavailable to Ms. Arnett (*Id.*). The handwritten notation on the witness statement that the "issue was stopped per Internal Affairs" supports the conclusion that prison administrators "thwart[ed] [Ms. Arnett] from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S.Ct. at 1854. Further, ADC defendants have not submitted any record evidence suggesting this interference did not occur, nor did they provide an alternate explanation for how this written statement or the handwritten notation on it came about or why Warden Faust told Ms. Arnett to stop writing and told her that Internal Affairs would handle the matter of her allegations of sexual abuse committed by Mr. Dewitt. *See, e.g., Jackson v. Coyne*, Case No. 3:17cv00174-TBR, 2018 WL 1125671, at *6 (W.D. Ky. March 1, 2018) (denying summary judgment where defendants

offered no evidence to rebut plaintiff's allegation that prison official threatened him with physical harm if plaintiff did not sign and dismiss grievance). Based on the record evidence viewed in the light most favorable to Ms. Arnett, the Court finds that genuine issues of material fact exist regarding whether administrative remedies were unavailable to Ms. Arnett.

### 4. Grievance MCP-17-00010

On January 10, 2017, Ms. Arnett filed a formal grievance alleging that she was a victim of "repeated sexual assault" by Mr. Dewitt, that prison officials failed to protect her from the abuse, and that prison officials retaliated against her after she reported the abuse (Dkt. No. 28-1). This grievance specifically names Mr. Dewitt, members of his family, Stacey Smith, Jennifer Smith, Chaplain Yancey, Warden Faust, Ms. Dixon, Ms. Dykes, and "prison staff [who] failed to protect [her] from the misconduct dispite [sic] awareness of this misconduct" (*Id.*). Two days later, on January 12, 2017, Ms. Arnett received a response from Warden Fitzgerald stating:

> Prior to the filing of this grievance, the allegations against Mr. Dewitt were investigated at the Unit level, forwarded to Internal Affairs for further investigation. The case was then transferred to the State Police and an arrest was made. The case has since been adjudicated in court. Your grievance is with merit.

(Dkt. No. 28-1, at 2). Ms. Arnett filed her lawsuit on September 7, 2017 (Dkt. No. 1).

ADC defendants failed to acknowledge this 2017 grievance in their brief in support of motion for summary judgment, their statement of facts, and their exhibits (Dkt. Nos. 22, 23). Despite swearing in her affidavit that she has "reviewed Ms. Arnett's Grievance File for purposes of *Arnett v. Norris, et al*, No. 1:17CV00076," and despite including grievances Ms. Arnett filed regarding other matters in 2010 and 2013, Ms. Higgins leaves out of her affidavit entirely MCP-17-00010 (Dkt. No. 23-B, ¶ 4-41). Similarly, in her affidavit, Ms. Grigsby offers as proof of Ms. Arnett's nonexhaustion that "Ms. Arnett did not appeal any grievances regarding Kenneth Dewitt or any sexual assault by Mr. Dewitt in 2010, 2011, 2012, 2013, or 2014" without acknowledging

MCP-17-00010 (Dkt. No. 23-A, ¶ 25). The Court is hard-pressed to find a reason why ADC defendants did not acknowledge grievance MCP-17-00010 anywhere in their submissions before the reply brief (Dkt. No. 30). Again, this gives the Court pause and raises concerns.

Ms. Arnett contends that, through this grievance, she exhausted even the requirements of Administrative Directive 14-16. Without acknowledging this blatant omission of record evidence, ADC defendants argue in their reply brief that Ms. Arnett did not exhaust grievance MCP-17-0010 because she did not appeal Warden Fitzgerald's decision (Dkt. No. 30, ¶ 3). Based on the record evidence before the Court, Ms. Arnett had no reason to appeal MCP-17-00010 to Ms. Grigsby's office or otherwise because Warden Fitzgerald's response stated her "grievance [was] with merit" (Dkt. No. 28-1, at 2); *cf. Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015) (finding inmate had not exhausted administrative remedies where inmate explicitly accepted warden's adverse grievance response).

ADC defendants assert that Ms. Arnett addressed three issues in grievance MCP-17-0010 in violation of Administrative Directive 14-16 and that Warden Fitzgerald did not address "either the second or third issues raised in the grievance" pursuant to AD 14-16 (Dkt. No. 30, ¶ 4, 5).

The Court disagrees with ADC defendants' characterization of grievance MCP-17-0010 as three individual issues. In the grievance, Ms. Arnett alleges that she was emotionally and sexually abused by Mr. Dewitt, that she was a victim of retaliation by prison officials after she reported the abuse, and that prison officials failed to protect her from the abuse (Dkt. No. 28-1). The conduct all stems from or is connected to Mr. Dewitt's abuse of Ms. Arnett and, if shown to be true, can be characterized as an ongoing systemic issue, rather than three individual issues facing Ms. Arnett.

Warden Fitzgerald's grievance response to Ms. Arnett states:

> Prior to the filing of this grievance, the allegations against Mr. Dewitt were investigated at the Unit level, forwarded to Internal Affairs for further investigation. The case was then transferred to the State Police and an arrest was made. The case has since been adjudicated in court. Your grievance is with merit.

(Dkt. No. 28-1, at 1). Viewing the record evidence in the light most favorable to Ms. Arnett, this response, particularly the phrase "forwarded to Internal Affairs for further investigation," could be interpreted to address an ongoing systemic issue (*Id.*).

Further, even if Ms. Arnett had to file three separate grievances for the misconduct she alleges, a requirement the Court does not find to apply under the circumstances, ADC defendants did not reject Ms. Arnett's grievance based on procedural flaws. In *Hammett v. Cofield*, 681 F.3d 945 (8th Cir. 2012), the Eighth Circuit found that an inmate had exhausted administrative remedies where a prison official decided a procedurally flawed grievance on the merits. *See also Foulk v. Charrier*, 262 F.3d 687 (8th Cir. 2001) (concluding administrative remedies unavailable where prison officials themselves failed to comply with grievance procedures). By responding to MCP-17-0010 as they did, and now arguing that Ms. Arnett needed to file three separate grievances for the misconduct she alleges, ADC defendants are attempting to narrow the scope of what issues were addressed in the grievance process without having informed Ms. Arnett along the way. *See, e.g.*, *Gillian v. Simmons*, Case No. 2:17cv00021-BSM-PSH, 2018 WL 4169198, at *10 (E.D. Ark. May 1, 2018), *report and recommendation adopted*, Case No. 2:17cv00021-KGB-PSH, 2018 WL 4169021 (E.D. Ark. Aug. 29, 2018) (finding plaintiff inmate's medical claim exhausted as to certain defendants where ADC health services limited its response by excluding defendants and only responding to one issue of several, collectively grieved by inmate as defendants' failure to take corrective action); *Halfacre v. Correct Care Sols.*, Case No. 5:16cv00313-JLH-JJV, 2017 WL 1064024, at *3 (E.D. Ark. Feb. 24, 2017), *report and recommendation adopted*, Case No. 5:16cv00313-JLH-JJV, 2017 WL 1064004 (E.D. Ark. Mar. 20, 2017) (finding no basis on which

to conclude that plaintiff inmate's medical grievance exhausted only part of an issue where prison personnel chose to limit the scope of the grievance through its response). Warden Fitzgerald's response notified Ms. Arnett that her grievance was "with merit" (Dkt. No. 28-1, at 2). The grievance form itself instructs the inmate: "If you are not satisfied with this response, you may appeal this decision within five working days. . . ." (Dkt. No. 28-1, at 2). A determination that her grievance was "with merit," viewed in the light most favorable to Ms. Arnett, is unlikely to be characterized as an unsatisfactory response from which to appeal. Viewing the record evidence in the light most favorable to Ms. Arnett, as the Court is required to do at this stage of the proceedings, Ms. Arnett had no reason to further appeal the grievance. Based on the record evidence, the Court finds that Ms. Arnett exhausted administrative remedies with respect to grievance MCP-17-0010.

### 5.      Grievance MCP-17-00921

On July 25, 2017, Ms. Arnett filed an Informal Resolution alleging that she felt she was being "punished" as "retaliation from [her] reporting an incident to Mrs. Holst at its second occurrence" (Dkt. No. 28-2, at 1). In the grievance, Ms. Arnett asserts that she was removed from her job as a mental health porter for reporting a movie about "people investigating a decorated army officer for sexually assaulting a peer in Afghanistan" being played that caused her to feel "emotionally disturbed considering [her] previous assault [] in prison" (*Id.*). The grievance was assigned number MCP-17-00921 (*Id.*). On August 24, 2017, Lori Holst responded to grievance MCP-17-00921, stating:

> Upon review of your grievance, it is found that you feel you were removed from your job assignment for stating you did not like a video that was shown in RPU. On 7-18-17, it was a staffing decision to release you from RPU to further your treatment. No one retaliated against you in any way by releasing you from RPU. You were never classified as a Mental Health porter and according to AD 14-16, a job assignment is not a grievable issue. Your grievance is without merit.

(Dkt. No. 28-2, at 3). Ms. Arnett appealed Ms. Holst's response on August 30, 2017 (*Id.*). On October 11, 2017, a director responded to Ms. Arnett's appeal, stating in relevant part:

> You appealed this by restating your complaint. Placement in and removal from RPU is a clinical decision made by the treatment staff. Your discharge from RPU was not due to punishment nor retaliation. A clinical decision was made that you were ready to be returned to general population. This grievance is found without merit.

(*Id.*, at 2).

ADC defendants did not acknowledge grievance MCP-17-00921 in their brief in support of motion for summary judgment, their statement of facts, and their exhibits (Dkt. Nos. 22, 23). In their reply brief, ADC defendants do not dispute that Ms. Arnett exhausted grievance MCP-17-00921; instead, they argue that grievance MCP-17-00921 is not applicable to the allegations in this action (Dkt. No. 30, ¶ 9). Ms. Arnett contends that the retaliation she alleges in grievance MCP-17-00921 relates to her reporting the abuse by Mr. Dewitt (Dkt. 28-9, ¶ 4).

Under the PLRA and controlling law, if "exhaustion was not completed at the time of filing, dismissal is mandatory." *Johnson*, 340 F.3d at 627. As a result, grievance MCP-17-00921, which admittedly was not exhausted until October 2017, after Ms. Arnett filed her complaint in this matter on September 7, 2017, is not relevant to the exhaustion issue before the Court.

### 6. Alleged Interferences with Ms. Arnett's Efforts At Filing Grievances

Ms. Arnett asserts that various prison officials obstructed her prior efforts at filing a formal grievance regarding Mr. Dewitt's abuse, retaliation by prison officials against Ms. Arnett for reporting the abuse, and prison officials' failure to protect Ms. Arnett from the abuse (Dkt. No. 28, at 13-16). According to Ms. Arnett, Mr. Dewitt threatened her not to report his abuse of her both explicitly and through his position of authority over her (Dkt. Nos. 1, ¶ 111, 124-25; 28, at 14; 31-1, at 1). Ms. Arnett also alleges that defendant Stacey Smith instructed her not to tell anyone about

the abuse in August 2014 (Dkt. Nos. 1, ¶ 143; 31-1, at 1).  According to Ms. Arnett, Warden Faust

and Ms. Dykes prevented her from filing a formal grievance in December 2014, as discussed *supra*

by the Court.   Ms. Arnett alleges that defendant Jennifer Smith tried to dissuade her from reporting

the sexual abuse she suffered to persons who may contact the authorities or media (Dkt. Nos. 1, ¶

170; 28, at 16; 31-1, at 1).  Ms. Arnett alleges that defendant Don Yancey pressured her to remain

silent in January 2015 when he sent her an inter-office communication stating:

> Carolyn, you and I have had this discussion prior to today.  <u>I do not want you doing
> anything at this time but attending class.</u>  I told you the other day that you were to
> wait until you got your 1-C and then a month past that, and then I would evaluate
> and consider you for a slot.  But if you continue to pursue to influence the leaders
> in the barracks to allow you in a teacher/leadership role, then I will have to re-
> evaluate your future in the PAL Program.  For now, just settle down, stay off the
> radar.  Use this time to pray and draw near to the Lord for direction.

(Dkt. No. 28-8) (emphasis in original).  She alleges that Mr. Yancey also "sternly told [her] that

he wished she had kept quiet about the matter" (Dkt. Nos. 1, ¶ 171; 31-1, at 1).

ADC defendants argue that Ms. Arnett offers no evidence that ADC staff members

prevented her from submitting grievances on a daily basis (Dkt. No. 30, ¶ 12).  They assert that

Ms. Arnett supports her allegations of interference only with her March 1, 2018, signed and

notarized handwritten statement and a typed, undated, and unsigned document purporting to be

"Affidavit No. 2" (Dkt. No 30, ¶ 11-12).  ADC defendants argue that Ms. Arnett makes no

allegation or reference to alleged interference by any staff members and that, in the document

purported to be Affidavit No. 2, no reference is made to grievances or ADC staff allegedly

preventing her from submitting grievances (*Id.*, ¶ 12).

Based on Ms. Arnett's verification of certain statements in her complaint, the 2014 witness

statement signed by Ms. Dykes and interrupted by Warden Faust, and the inter-office

communication from Mr. Yancey, the Court finds that Ms. Arnett has offered record evidence that

supports Ms. Arnett's contention that ADC staff members prevented her from submitting grievances. Viewing the record evidence in the light most favorable to Ms. Arnett, the Court finds that Ms. Arnett has raised an inference that prison officials interfered with her ability to file grievances through a series of explicit statements and alleged conduct that pressured her to remain silent about the abuse by Mr. Dewitt, the retaliation against her for later reporting the abuse, and the failure to protect her from such abuse.

Thus, the Court concludes that Ms. Arnett has raised a genuine issue of material fact regarding whether administrative remedies were unavailable to her. *See Ross*, 136 S.Ct. at 1860 (finding administrative remedies unavailable where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation). The Court cannot grant the ADC defendants summary judgment based on an alleged failure to exhaust administrative remedies on the record before it. Defendants bear the burden to show the plaintiff failed to exhaust available administrative remedies. *Lyon v. Vande Krol*, 305 F.3d 806, 809 (8th Cir. 2002); *see also Porter*, 781 F.3d at 451. Based on the record evidence before the Court viewed in the light most favorable to Ms. Arnett, ADC defendants have failed to meet their burden.

**IV.     Conclusion**

After carefully considering the record evidence and drawing all reasonable inferences in favor of Ms. Arnett, the Court finds that a genuine issue of material fact exists as to the operative grievance policy Ms. Arnett did exhaust or should have exhausted. The Court also finds, based on the record evidence and drawing all reasonable inferences in favor of Ms. Arnett, that a genuine issue of material fact exists as to whether administrative remedies were available to Ms. Arnett or whether interference thwarted Ms. Arnett's efforts to exhaust her administrative remedies in regard

to the claims she raises. As to the 2017 grievance MCP-17-0010, the Court finds that Ms. Arnett exhausted even the administrative remedies the ADC defendants contend control. After carefully considering the record evidence and drawing all reasonable inferences in favor of Ms. Arnett, the Court denies ADC defendants' motion for summary judgment on exhaustion. For the foregoing reasons, the Court grants Ms. Arnett's motion for leave to file an executed Exhibit No. 10 (Doc. #28-10), *INSTANTER*, grants Ms. Arnett's motion for leave to file supplemental documents in response to ADC defendants' motion for summary judgment, and denies the ADC defendants' motion for summary judgment on the issue of exhaustion.

So ordered this 28th day of September, 2018.

_Kristine G. Baker_
Kristine G. Baker
United States District Court Judge